IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 24, 2024 Session

**STATE OF TENNESSEE v. WILLIAM SWAFFORD**

**Appeal from the Criminal Court for Hamblen County**
**No. 19CR601      Alex E. Pearson, Judge**

_____

**No. E2023-01273-CCA-R3-CD**

_____

The Defendant, William Swafford, was convicted by a Hamblen County jury of especially aggravated kidnapping, aggravated assault, and rape, for which he received an effective sentence of fifty-five years' imprisonment. On appeal, he argues that the evidence is insufficient to support his conviction of especially aggravated kidnapping and that the trial court erred by admitting the preliminary hearing testimony of the Defendant's late wife. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JILL BARTEE AYERS, JJ., joined.

Mitchell A. Raines and William W. Gill, Assistant Public Defenders – Appellate Division (on appeal); Todd Estep, District Public Defender; and Roland E. Cowden, Assistant District Public Defender (at trial), for the appellant, William Swafford.

Jonathan Skrmetti, Attorney General and Reporter; Nicholas W. Spangler, Associate Solicitor General; Dan E. Armstrong, District Attorney General; and Kimberly L. Morrison, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On November 2, 2020, a Hamblen County Grand Jury indicted the Defendant for the especially aggravated kidnapping, aggravated assault, and aggravated rape of the victim. At the Defendant's May 2023 trial, recordings of two 911 calls dated November 2, 2019, were played for the jury through the testimony of Eric Carpenter, the executive director of the Hamblen County 911 dispatch. In the first recording, timestamped at 2:16 a.m., the caller identified himself as Alan Moore and stated that a truck was parked near his home. "Ten or fifteen minutes" after the truck arrived, Moore heard a woman

screaming "like she was in distress," followed by the slamming of the vehicle's doors. Moore assumed that the driver had forced the woman back into the vehicle. Moore began "yelling" at the driver of the vehicle, who started the vehicle and drove down nearby Leeper's Ferry Road. He identified the vehicle as a "large pickup truck" but remarked that it was difficult to see it in the dark. On cross-examination, Carpenter testified that a police unit from the Hamblen County Sherrif's Office was dispatched to the location Moore described.

In the second recording, timestamped at 7:58 a.m., the caller identified herself as Lacee Burton and stated that a naked woman, who looked as though she had been "severely beaten," had walked to Burton's home seeking assistance. Burton identified the woman as the victim and invited her into Burton's home to get warm while they waited for assistance. On cross-examination, Carpenter testified that several police units were dispatched to Burton's home following her call.

Jessica Ewing testified that she was close friends with the victim and attended a Halloween party with her in the late hours of November 1, which lasted until the early morning of November 2, 2019. After leaving the Halloween party, Ewing and her then-husband, Taylor Rouse, went to Bud's Bar along with the victim, arriving around 1:00 a.m. Ewing identified herself and the victim in a surveillance video recording from Bud's Bar. Ewing estimated that she and Rouse remained at the bar for between forty-five minutes to an hour before informing the victim that they were ready to leave. The victim responded that she would be ready to leave soon, so Ewing and Rouse went to wait in their vehicle. While waiting for the victim, Ewing saw a man and woman enter a Jeep together and drive away. Ewing did not recognize either individual but later realized that the woman had been the victim. Rouse reentered the bar to collect the victim approximately five minutes later and saw that the victim had already left.

Ewing called the victim to ask where she had gone, and the victim responded that she and the man with whom she had left were "on our way back." At 1:46 a.m., the victim texted Ewing, "Please don't [leave]." The victim texted again at 2:09 a.m., "Please wait on me I'm so [scared]." Ewing responded, asking where the victim was and providing Rouse's address in Morristown. At 2:26 a.m., Ewing texted the victim, "I don't care what you're doing, I just want to make sure you're ok. Let me know if we need to come get you." She continued to text the victim, asking where she was and imploring her to answer her phone. She also attempted to call the victim, but the victim did not answer.

On cross-examination, Ewing testified that the victim had been drinking during the Halloween party but was unsure how much the victim had drunk. Ewing did not believe that the victim was intoxicated either at the party or while she was at the bar. Ewing recalled that she spoke with Detective Jim Brooks with the Hamblen County Sheriff's Office on the morning of November 2, 2019, and provided a written statement. In her statement, Ewing described the man with whom the victim had left as "mid-thirties to early-

forties" with a "medium build," "tattoos on his arms," and short brown hair and a beard. She stated that she saw the victim get into the Jeep with the unfamiliar man, with whom she had seen the victim speaking at the bar, and drive away. She stated that she called the victim, who told her "she would be right back." Ewing stated that she waited for between ten and fifteen minutes before calling the victim "a few more times," with the victim responding "each time" that they would be "right back." Ewing stated that she and her then-husband then left and drove to a nearby gas station, where they told the victim to meet them. The victim responded not to leave and to wait on her.

Ewing testified that she did not call 911 after receiving the text messages from the victim or being unable to reach her via phone call. Ewing recalled that the victim left the bar willingly and that she did not see any signs of a struggle between the victim and the man.

Alan Moore was unavailable to testify at trial due to illness. His preliminary hearing testimony was played for the jury. At the Defendant's preliminary hearing, Moore testified that he was awakened by his dog in the early morning of November 2, 2019. Moore consulted his home security cameras and watched a vehicle pull to a stop and park at the intersection of Powers Road and Leeper's Ferry Road. When the vehicle remained stationary for "about five minutes," Moore "got concerned" and went outside to investigate. Moore recalled that it was foggy, very dark, and "quiet as it could be," but that he soon heard a "clumping" sound, followed by a woman's "loud, screeching scream" crying for help. Moore began shouting back and called 911. While he was on the call, the vehicle "took off" down nearby Leeper's Ferry Road, then turned to go down River Road. Moore was unable to identify the vehicle, though he thought it was a pickup truck. After reviewing the video from his home security cameras, he learned that the vehicle arrived at the intersection at 2:07 a.m.

Lacee Burton testified that she awoke before the rest of her family in the early morning of November 2, 2019. Around 7:00 or 8:00 a.m., she answered her doorbell and saw the victim standing "completely naked" and "covered in blood," her legs "severely" cut up. Burton invited the victim into her home, gave her a blanket to warm her, and called 911. She recalled that the victim was actively bleeding near her eye, had blood matted in her hair, and had sustained scratches and cuts on her arms and legs.

After Burton called 911, she asked the victim what had happened to her. The victim told Burton that she had left Bud's Bar in the early hours of the morning with a man, whom she noted had a tattoo on his neck. While in the man's Jeep Wrangler, the victim "kept telling him that she wanted to go back to the bar and he just kept driving, refused to take her back." The victim told Burton that the man had raped and beaten her. On cross-examination, Burton testified that the victim told her that she had been left in the woods after her rape and had to swim through a river to get to safety. The victim did not provide an estimate as to how much time had elapsed between her abandonment and arrival at

Burton's home.

The victim testified that on November 1, 2019, she, Ewing, and Rouse went to a Halloween party which continued into the early hours of November 2. After leaving the Halloween party, the trio went to Bud's Bar, where the victim met a man whom she identified as the Defendant. She identified herself and the Defendant in the surveillance video from Bud's Bar. The Defendant and the victim shook hands and began talking. The victim recalled that the Defendant was "sad" during their conversation and that she attempted to encourage him to be more positive. The victim testified that she was not intoxicated, recalling that she had two and a half drinks at the Halloween party and then "some sips" at the bar. Ewing and Rouse later told the victim that they were "going out to the truck to talk." The victim stated that she did not know the Defendant's name or why she left the bar with him but that she nevertheless voluntarily left with him in his Jeep.

Shortly after she left the bar with the Defendant, the victim began to feel "afraid all over," testifying that she "did not feel safe" and "did not want to be in the vehicle with him." She did not know where the Defendant was driving, only that they were "on a back road." The victim spoke with Ewing via text message and phone call, asking her to wait for her and telling her that she was scared. The victim asked the Defendant to "please take me back" to the bar, where she stated her friends were waiting for her, but the Defendant "never responded." The Defendant continued driving "for a good amount of time" before stopping the vehicle while the victim was texting. The victim testified that the Defendant forcibly took her cell phone and smart watch from her and threw them out the window. The victim began screaming and calling for help. She testified that she wanted to get out but could not because the Defendant had the doors locked and was hitting her.

After the Defendant removed the victim's cell phone and smart watch, he continued driving "for a little bit" before stopping the vehicle again. The victim testified that the Defendant then unzipped his pants and removed his penis. The victim began crying and stated that she did "not want to do this." The victim recalled that the Defendant grabbed her hair and forced her to perform oral sex on him. Though she fought against the Defendant, he forcibly removed the victim's clothes and raped the victim by placing his penis inside of her vagina. The victim testified that she pleaded with the Defendant to stop, offering him money and any kind of help he needed, but that the Defendant would not stop raping her. She also recalled that the Defendant "brutally beat[]" her the entire time, hitting her "all over" and choking her at times. The victim stated that though she found it difficult to breathe, she continued to cry for help throughout the assault.

The victim testified that she ultimately escaped the Defendant's Jeep by opening the door and rolling out of the vehicle. However, the Defendant followed the victim out of the vehicle and continued to beat her until she lost consciousness. When the victim awoke, she immediately ran away into the nearby woods. She did not remember whether the Defendant or his vehicle were still nearby, testifying that she did not look back and simply

began running. She recalled that she was completely naked, that the weather was very cold and foggy, and that it was very dark. The victim ran through the woods "for a little bit" before reaching a large body of water through which she attempted to swim despite its strong current. The victim testified that she was unable to touch the bottom of the water and swam as fast as she could, eventually exiting at a large field. She walked through the field and attempted to get warm before reentering the woods. She continued searching for assistance, trekking through a briar patch and encountering barbed wire along the way until she saw a red light at the top of an incline. The victim testified that she was forced to climb up the incline on her hands and feet and that she fell and scraped her stomach once. Upon reaching the top of the incline, the victim recognized it as a railroad track and stopped there to rest. She recalled that she was very cold and was bleeding from her face and head.

When daylight broke, the victim began walking along the railroad track and eventually reached a road. The victim walked past several homes, which she described as appearing uninviting, before arriving at a white house with a light on. The victim walked onto the porch and attempted to cover her nudity by hiding behind the porch's railing. After she rang the doorbell, "a lady peek[ed] out the window," and a man exited the home shortly thereafter. The victim told the man that she had been "kidnapped, brutally beaten, and raped" and asked if she could use his phone to call the police. She stated that the woman then followed the man onto the porch, offered her blankets, and called the police.

The victim was taken to the hospital by an ambulance, and the jury viewed photographs of her injuries, which included cuts beside her right eye and in her scalp, bruising on her face, neck, ear, legs, bottom, and chest, and road rash and scratches on her arms, legs, hands, and back. The victim described the pain from her injuries as extreme. She stated that she was unable to work for two weeks following her attack and that even then, she experienced chest pains when performing "basic things" like "rolling in bed, going to work, [and] walking quickly." She also noted that the swelling and bruising to her face took a long time to heal.

The victim testified that she worked with Detective Jim Brooks in his investigation. Detective Brooks presented the victim with a photographic lineup of six men, from which she identified the Defendant and signed her initials beside his photograph.

On cross-examination, the victim testified that Bud's Bar was located near Rouse's home, which she had never visited. She recalled that Rouse purchased a beer for her when they arrived at Bud's Bar, but after taking "a few sips," she sat it down because she did not like its taste. The Defendant later purchased a second beer for the victim, of which she drank "a few sips." The victim was unsure exactly when she arrived at Bud's Bar. She agreed that after she met the Defendant and shook hands with him, she moved to sit nearer to him. She recalled that the Defendant placed his hand on her thigh at one point and that she "pull[ed] his hat." She was unsure of whether she also placed her hand on the Defendant's leg but conceded that she could have.

The victim testified that she sustained bruising in her mouth from the Defendant's forcing her to perform oral sex on him. The victim's clothing was later recovered from the woods, and she agreed that though some of her clothing had been found hanging from tree branches, it did not seem to have been torn or ripped. The victim was aware that her clothing had been subjected to DNA testing and that this testing had not shown any evidence of semen, which she testified was due to the Defendant not ejaculating during the encounter. The victim testified that she had been menstruating and was wearing a tampon when she was raped.

The victim testified that there were no houses near where she was raped and that she was unsure how long she spent in the woods afterwards. She stated that she did not attempt to recover her lost cell phone and smart watch because she did not know where she was.

Carolyn Williams, a sexual assault nurse, testified as an expert in examining sexual assault victims. Nurse Williams testified that she recorded the victim's narrative of her rape and recalled that the victim stated that she thought she would die. Nurse Williams collected a sexual assault kit from the victim and performed a physical examination. Nurse Williams' examination identified lacerations beside the victim's right eye and in her scalp, the former of which she noted was a "pretty good size," as well as bruising on her face, neck, ear, legs, arms, hands, bottom, and chest, and abrasions and scratches on her arms, legs, hands, and back. Nurse Williams also noted that the victim's left cheek was swollen and that the victim had sustained a black eye. Nurse Williams also identified an injury to the labrum of the victim's nose, from which the victim was bleeding during her examination. Nurse Williams testified that the bruising on the victim's neck was consistent with strangulation and that the scratches and abrasions were consistent with someone falling onto a rough surface. She also noted that one of the victim's nails was chipped and that the victim had "a lot of dirt," mud, and leaves on her feet and back. The victim was unable to open her mouth fully due to her injuries and spoke with a "raspy voice."

Nurse Williams further testified that she performed a vaginal exam of the victim which reflected that the victim had sustained three linear tears to her vagina. Nurse Williams stated that these types of injuries are normally caused by blunt force trauma, but the requisite amount of force would differ based on an individual's anatomy. She noted that the victim had been menstruating when she was raped. From her examination, Nurse Williams concluded that the victim's injuries were consistent with her statements and narrative that she had been vaginally penetrated.

On cross-examination, Nurse Williams stated that the vaginal tears the victim sustained could have been caused by consensual sex. Nurse Williams agreed that the victim was wearing a tampon when she examined her. Nurse Williams also noted that during her narrative, the victim disclosed that she had drank only a single beer. Nurse

- 6 -

Williams stated that she did not perform a toxicology report on the victim because the victim did not report the involvement of drugs. On redirect examination, Nurse Williams testified that the victim did not appear impaired during her examination.

Agent Kim Lowe of the Tennessee Bureau of Investigation testified as an expert in DNA and forensic biology analysis regarding her testing of the victim's sexual assault kit, the Defendant's clothing, and several blood samples from the Defendant's vehicle, which she received from Detective Brooks. Agent Lowe tested the victim's vaginal swabs, oral swabs, and tampon and found no presence of semen. She also tested blood recovered from the right sleeve of the Defendant's shirt and found it to be consistent with the victim's DNA sample. She tested the Defendant's underwear and found no evidence of the victim's DNA. Agent Lowe also tested a blood sample taken from the Defendant's vehicle and found it consistent with the Defendant's DNA. Agent Lowe testified that an individual's swimming or drinking could limit her ability to detect any sperm from vaginal or buccal swabs.

Nathan White testified that he was at Bud's Bar in the early morning of November 2, 2019. He recalled overhearing the Defendant and the victim discuss leaving the bar to go to a bonfire. The next day, several officers came to the bar and questioned White about the Defendant. White told the officers that he knew the Defendant and that they lived in the same neighborhood.

Officer Donnie Davis, formerly of the Hamblen County Sheriff's Department, testified that he responded to Burton's 911 call. Video footage of Officer Davis's response to Burton's home and conversation with the victim, taken from Officer Davis's body camera, was played for the jury. The victim provided her account of what she had endured and described the Defendant's appearance. While Officer Davis awaited the ambulance's arrival, he continued to question the victim regarding the details of her attack, potential witnesses, her clothing, and her description of the Defendant. After the victim was taken to the hospital, Officer Davis met with Detective Brooks, who similarly questioned the victim and photographed her injuries. While at the hospital, the victim provided details about her cell phone, which enabled detectives to locate it and her smart watch at the corner of Moore's property. After speaking with Moore, Officer Davis drove up River Road and saw evidence of a vehicle having pulled off the road. There, Officer Davis saw "clothes hanging up in the trees" and "a boot laying [sic] on the ground." He also noted that the grass had been scuffed and was muddy in places. Officer Davis called Detective Brooks to inform him that he believed he had found the crime scene.

Officer Davis did not assist in the collection of evidence from the crime scene but instead went to Bud's Bar, where he interviewed potential witnesses and collected surveillance footage. Officer Davis soon learned the Defendant's name and that he lived in Cocke County, so he contacted the Cocke County Sheriff's Department to assist in locating the Defendant. Officer Davis then drove to the Defendant's home and arrested him. A video recording of the arrest, taken from Officer Davis's body camera, was played

for the jury. The video showed the Defendant and his wife, Jessie Swafford, standing outside their home. After being placed under arrest for aggravated rape, the Defendant agreed that he left the bar with a woman the previous night. Officer Davis led the Defendant to his vehicle, and as they left, Mrs. Swafford stated that she "hate[d]" the Defendant and returned inside her home. Later, Mrs. Swafford returned outside and spoke with officers regarding the Defendant's charges.

On cross-examination, Officer Davis stated that the victim was concerned as to when to call her parents and what to tell them during their initial interview. He also recalled that the victim stated that she may have lost her cell phone in the Defendant's vehicle. He testified that the Defendant's "front torso" was in complete view when he arrested him and that he did not see any signs of injuries anywhere on the Defendant's body, though he conceded that he was more concerned with properly handcuffing the Defendant. On redirect examination, Officer Davis recalled that he saw a bump or scratch on the Defendant's forehead.

Detective Jim Brooks of the Hamblen County Sheriff's Department testified that he began investigating the victim's rape by interviewing Ewing and Rouse. He then went to the hospital to interview the victim and took photographs of her injuries. He testified that the victim's injuries were consistent with someone who had been forcibly held down and who had rolled out of a vehicle onto a rough surface. The victim gave Detective Brooks the login information for her "Find My iPhone" account, which allowed him to locate the victim's lost cell phone and smart watch near Moore's property. While collecting the victim's lost belongings, Detective Brooks spoke with Moore regarding his observations. Detective Brooks then went to the crime scene to collect evidence. There, Detective Brooks found clothing strewn about the crime scene and along the nearby road, including a boot, a blue jean shirt, a necklace, and a pair of pants hanging from a tree. The victim later identified this clothing as her own. Detective Brooks recalled that the victim's underwear and second boot were found inside her pants, the legs of which had been turned inside out.

Detective Brooks testified that he presented the victim with a photographic lineup which included a photograph of the Defendant. Upon her review of this lineup, the victim identified the Defendant as her attacker and signed and dated his photograph.

Detective Brooks recalled that he accompanied Officer Davis to Bud's Bar. While Detective Brooks collected the bar's surveillance footage, Officer Davis spoke with White and learned the Defendant's name and address. After the Defendant's arrest, Detective Brooks went to the Defendant's home, where a yellow Jeep was parked. Mrs. Swafford stated that the Defendant had driven the yellow Jeep the previous night. She also gave Detective Brooks the t-shirt the Defendant wore the previous night. Detective Brooks sent the Defendant's t-shirt, which was marked with bloodstains, to the Tennessee Bureau of Investigation for testing.

Detective Brooks interviewed the Defendant following his arrest, and a recording of this interview was played for the jury. During the interview, the Defendant stated that he went to "a bar" and had a few drinks. He recalled that the bar was very busy and that he met the victim there, describing her as "obnoxious" and "all over me." He stated that he left the bar with the victim and that he intended to simply "ride around and drink beer." He agreed that the victim stated she wanted to be taken back to her friends and that he refused this request because he wanted to "go home." The Defendant said that at some point during their drive, the victim removed her clothes and began touching his leg. The Defendant interpreted this as an attempt to steal his wallet, so he began "physically fight[ing]" the victim in an attempt to remove her from his vehicle. He denied choking the victim and instead averred that he had to wrap his arm around her head to remove her from his vehicle. The Defendant stated that the victim fought against him because she wished to remain in his vehicle. The Defendant said that he threw the victim's clothing out of his vehicle after removing her. He denied raping the victim or having sex with her.

After interviewing the Defendant, Detective Brooks photographed several injuries he identified above the Defendant's left eye and, on his neck, as well as scratches on his forearms and "reddening" on his knuckles and wrists. Detective Brooks also took a DNA sample from the Defendant. Later, Detective Brooks procured a search warrant to search the Defendant's Jeep and identified several blood spatters on the exterior of the vehicle and on the left side of the driver's seat. He also recovered several "yellow colored hairs" from the left side of the driver's seat and a "gold colored chain" and "clasp," which he testified were consistent with the necklace recovered from the crime scene. The jury viewed photographs of the Defendant's injuries, and the evidence recovered from his Jeep.

The jury also heard a recording of a phone call between the Defendant and Mrs. Swafford made after he was arrested on November 2, 2019. During this call, the Defendant told Mrs. Swafford that "they're f****** lying on me," to which Mrs. Swafford responded that she had "seen the pictures" and "video" of the Defendant leaving the bar with the victim and that she "hate[d]" the Defendant. The Defendant continued to deny the allegations against him and reiterated that he "put [the victim] out" of his vehicle and that the victim did not want to leave. Mrs. Swafford protested that the Defendant had "cheated" on her and ended the call. Detective Brooks said that the Defendant and Mrs. Swafford spoke on several more occasions before the Defendant was released on bond on November 4, 2019. The Defendant's preliminary hearing was scheduled for November 14, 2019, but the Defendant failed to appear. The Defendant was ultimately arrested in West Virginia, and his preliminary hearing was held on December 19, 2019.

Jessie Swafford testified as a defense witness at the Defendant's preliminary hearing but passed away prior to the Defendant's trial. The State introduced her preliminary hearing testimony, and the trial court instructed the jury to treat Mrs. Swafford's testimony "the same as if you heard it live from the witness stand . . . just as if we heard it today," as

- 9 -

he had similarly instructed the jury regarding Moore's testimony.

At the Defendant's preliminary hearing, Mrs. Swafford testified that on November 2, 2019, the Defendant called her from Bud's Bar to ask if she wanted "to go Jeep riding," which she described as "rid[ing] around the mountains and stuff and drink[ing]." Mrs. Swafford agreed, and the Defendant drove to their home to pick her up. Mrs. Swafford stated that when the Defendant arrived, "he had a girl with him that was sitting in the passenger's side." She averred that she had never met the victim before and described her as tall with "bleach blonde hair." Mrs. Swafford stated that she brought her pet dog along for the ride.

Mrs. Swafford testified that she believed the Defendant brought the victim with him to "piss me off," as she and the Defendant were "sort of split up" at the time. Mrs. Swafford recalled that she was not intoxicated but that the Defendant and the victim were. She stated that while driving, the Defendant began "making comments" about the victim's appearance and that the victim removed her clothes. Mrs. Swafford testified that after the Defendant parked the vehicle "off the side" of Leeper's Ferry Road, the victim began performing oral sex on the Defendant. She stated that though there was little room in the backseat of the Jeep with both Mrs. Swafford and the pet dog present, the Defendant leaned his seat back and invited Mrs. Swafford to join him and the victim. Mrs. Swafford testified that she inserted her finger into the victim's vagina, but after realizing that the victim was menstruating, she and the Defendant no longer wished to have sex with the victim. She asserted that the victim became "upset" and "act[ed] crazy" before writing a text message that she was scared. Mrs. Swafford asked the victim why she was scared, and the Defendant grabbed the victim's phone. Mrs. Swafford testified that the victim resisted and that a scuffle ensued between the victim and the Defendant, with the victim hitting herself in the face with her phone before the Defendant threw it out of the vehicle.

Mrs. Swafford said that the Defendant did not strike the victim but instead argued with her "back[] and forth" and that at some point, the victim fell out of the passenger's side of the vehicle and landed on her back. When the victim stood up, she cut her head on the side of the Jeep door and then reentered the vehicle. The victim and the Defendant continued their argument, and Mrs. Swafford asserted that "every time [the Defendant] would come to the passenger's side, [the victim] would go to this side." After some time, the victim "finally" exited the vehicle and "took off running." Mrs. Swafford testified that she took the Defendant back home but that she later returned alone to attempt to locate the victim.

Mrs. Swafford testified that she lied to the detectives when they arrived to search her vehicle after the Defendant was arrested because she had three children and "it wasn't supposed to be that big." She denied that the Defendant raped or kidnapped the victim.

On cross-examination, Mrs. Swafford testified that she "put the [victim's] clothes

out" of the vehicle because the victim "wouldn't let me help her get them on." She clarified that the Defendant parked the Jeep on two different sides of Leeper's Ferry Road. She explained that she told the Defendant she "hate[d]" him when he was arrested because "it was a mess that he got me in." She stated that the Defendant never should have called her to go "Jeep riding." She recalled that she "put [the Defendant] in jail for [thirty] days" in March of 2019, though she denied that the Defendant kidnapped her and stated that she had "done some meth" and was "drunk" at the time. She did not recall discussing with the Defendant during any of her phone calls how she would testify and stated that the "threesome was supposed to have never been brought up" because of their three children.

Detective Brooks testified that he had not heard Mrs. Swafford's account of the events of November 2, 2019, before the preliminary hearing. He did not collect any evidence that a dog had been in the Jeep. He stated that neither the Defendant nor the victim corroborated Mrs. Swafford's account. Detective Brooks recalled that Mrs. Swafford was "very upset" with the Defendant when the Defendant was arrested and that she did not indicate that she had been involved in the events giving rise to the Defendant's charges.

On cross-examination, Detective Brooks testified that Officer Christopher Sanner investigated the Leeper's Ferry area after Moore's 911 call but was unable to locate the vehicle Moore had described. Detective Brooks was unsure of how long Officer Sanner investigated the area before leaving. He testified that no data extraction had been performed on either Ewing's or the victim's cell phones. He recalled that it was between thirty-two and thirty-five degrees in the early morning hours of November 2, 2019. Detective Brooks did not remember any mention of the Defendant's having used a condom during his investigation. He did not perform toxicology tests on the Defendant or the victim. He agreed that the victim initially stated that the Defendant had driven a silver Jeep and that her sexual assault had taken place entirely within the Jeep. She also stated that she was "on both sides of the vehicle" during her assault and did not give a timeframe for how long she spent seeking shelter. Detective Brooks stated that he did not believe the injury he documented on the Defendant's neck to be a "hickey" and agreed that the Defendant's forearms would have been covered by his sleeves. He also stated that the redness documented on the Defendant's wrists could have come from his handcuffs. He agreed that the Jeep had a manual transmission shift in the floor of its cabin. Detective Brooks referred to a diagram he had made of the victim's potential route through the woods to Ms. Burton's house and identified the Nolichucky River as the body of water through which the victim swam.

The State rested, and the Defendant did not present additional proof. The jury convicted the Defendant of rape as the lesser included offense of aggravated rape, and of aggravated assault and especially aggravated kidnapping as charged. Following a sentencing hearing, the Defendant received an effective sentence of fifty-five years' imprisonment. The Defendant filed an unsuccessful motion for new trial, and this timely

appeal followed.

## ANALYSIS

**A. Sufficiency of the Evidence.** The Defendant first asserts that the evidence presented at trial is insufficient to support his conviction of especially aggravated kidnapping. He contends that the evidence demonstrates that he did not substantially interfere with the victim's liberty as required under our law because her confinement was incidental to her rape and aggravated assault. The State responds that the Defendant's confinement of the victim was not incidental to his other offenses.

Especially aggravated kidnapping, as relevant to this case, is defined as false imprisonment "[w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-305(a)(4). "A person commits . . . false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id. § 39-13-302(a). As relevant here, "serious bodily injury" is defined as "bodily injury that involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; [or] (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" Id. § 39-11-106(a)(34).

> When jurors are called upon to determine whether the State has proven beyond a reasonable doubt the elements of . . . especially aggravated kidnapping, trial courts should specifically require a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction.

State v. White, 362 S.W.3d 559, 578 (Tenn. 2012). Factors to consider when determining whether there is substantial interference of the victim's liberty include "the nature and duration of the victim's removal or confinement by the defendant"; "whether the removal or confinement occurred during the commission of the separate offense"; "whether the interference with the victim's liberty was inherent in the nature of the separate offense"; "whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so"; "whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective"; and "whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense." Id. at 580-81. When, as here, a trial court properly instructs the jury on the White factors, we review a conviction of especially aggravated kidnapping for the sufficiency of the convicting evidence. Id. at 562.

"Because a verdict of guilt removes the presumption of innocence and raises a

presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

The Defendant maintains that consideration of the White factors indicates that his confinement of the victim was incidental to the aggravated assault and rape, and, accordingly, the evidence is insufficient to support his conviction for especially aggravated kidnapping. He argues that his confinement of the victim began when the Defendant stopped his vehicle and began striking the victim because it was at this point that the victim testified that she was unable to leave the Jeep. Though the victim requested to be taken back to her friends, the Defendant maintains that he was under no obligation to comply with this request and that regardless, the victim did not request to be let out of the vehicle. He asserts that this confinement of the victim concluded when his rape and aggravated assault concluded, so the confinement overlapped entirely with and was inherent in the commission of the other offenses. He argues that the Defendant did not reduce the risk of detection or prohibit the victim from summoning assistance because Moore responded to the victim's screams and called 911. Finally, he contends that though the victim was forced

- 13 -

to walk nude through harsh terrain without clothing after he completed his aggravated assault and rape of her, this risk of harm materialized through her voluntarily leaving the bar with him.

Viewing the evidence in the light most favorable to the State, we conclude that the evidence is sufficient to sustain the Defendant's conviction for especially aggravated kidnapping. The Defendant makes much of the fact that the victim initially left Bud's Bar with him willingly in support of his argument that he did not begin his confinement of the victim until he began his aggravated assault. We disagree. The victim testified that she began feeling unsafe and "afraid all over" shortly after she voluntarily left the bar with the Defendant, that she did not know where the Defendant was driving, and that she asked the Defendant to take her back to the bar multiple times. In the face of the victim's pleas to be returned to her friends, the Defendant remained silent and continued to drive the victim into unfamiliar territory "for a good amount of time." The victim's requests to be driven back plainly notified the Defendant that she no longer wished to go with him, and a rational jury could have concluded that this, coupled with the fear evidenced by her testimony and text messages to Ewing, indicated a substantial interference with her liberty. See White, 362 S.W.3d at 580-81. The Defendant further reduced the victim's ability to summon assistance by taking her cell phone and smart watch from her and throwing them out the window. See id. After the victim's screams summoned Moore, the Defendant paused his assault just long enough to drive away to avoid detection and to prevent the victim from summoning further aid. See id.

Additionally, the Defendant's confinement and removal of the victim placed her in significant peril beyond the independent threats of harm inherent in his separate offenses. The Defendant abandoned the victim after completing his aggravated assault and rape. Lost, naked, and cold, the victim was forced to trek through the woods, swim through a river, step in briar patches, climb up steep inclines on her hands and feet, and walk along a public road from the early morning until daybreak. By the time the victim arrived at safety and was taken in by Burton, she had sustained a plethora of injuries, some of which were actively bleeding. This proof is more than sufficient for a reasonable juror to conclude beyond a reasonable doubt that the Defendant knowingly removed and confined the victim in a manner which substantially interfered with her liberty.

We also conclude that the evidence is sufficient to establish that the Defendant's false imprisonment of the victim caused her to suffer serious bodily injury based on extreme physical pain. This court has explained that when determining whether a victim's injuries amount to serious bodily injury, the "subjective nature of pain is a question of fact to be determined by the trier of fact." State v. Goff, No. W2020-00153-CCA-R3-CD, 2020 WL 7040981, at *4 (Tenn. Crim. App. Nov. 30, 2020) (citing State v. Love, No. E2011-00518-CCA-R3-CD, 2011 WL 6916457, at *4 (Tenn. Crim. App. Dec. 28, 2011); State v. Dedmon, No. M2005-00762-CCA-R3-CD, 2006 WL 448653, at *5 (Tenn. Crim. App. Feb. 2006) ("The difference between 'physical pain' and 'extreme physical pain' is

- 14 -

analogous to the difference between 'bodily injury' and 'serious bodily injury,' and as such, determining the severity of pain suffered is within the province of the jury.")). Taken in the light most favorable to the State, the evidence adduced at trial demonstrated that during his confinement of the victim, the Defendant raped, choked, and punched the victim in her head, face, arms, and legs, before abandoning her in the woods. The victim was later treated for her injuries, which included lacerations to her right eye and in her scalp, bruising on her face, neck, ear, legs, arms, hands, bottom, and chest, abrasions and scratches on her arms, legs, hands, and back, a black eye, and three linear tears to her vagina. The victim described her pain as extreme both during and after her attack, noting that she was unable to work for two weeks and that her injuries made it difficult to perform basic tasks like "rolling in bed, going to work, [and] walking quickly." This evidence is sufficient to support a reasonable jury's conclusion that the victim suffered serious bodily injury based on extreme physical pain. See State v. Johnson, No. W2012-01754-CCA-R3-CD, 2013 WL 5488522, at *7 (Tenn. Crim. App. Sept. 30, 2013) (collecting cases and finding sufficient evidence of serious bodily injury based on extreme physical pain where the victim suffered cuts, bruises, and swollen eyes, and testified that these injuries caused extreme physical pain).

Though "[w]e need only consider one of the factors for our review[,]" we also note that the victim testified that the laceration above her right eyebrow resulted in a scar, and a scar is sufficient proof of serious bodily injury based on protracted or obvious disfigurement. See State v. Darvin, No. M2018-01669-CCA-R3-CD, 2019 WL 4440220, at *4 (Tenn. Crim. App. Sept. 17, 2019). Accordingly, the evidence is sufficient to sustain the Defendant's conviction for especially aggravated kidnapping. The Defendant is not entitled to relief.

**B. <u>Admission of Mrs. Swafford's Testimony.</u>** The Defendant also argues that the trial court erred in admitting Mrs. Swafford's preliminary hearing testimony at trial. Prior to the Defendant's trial, the State filed a motion expressing its intent to introduce Mrs. Swafford's preliminary hearing testimony at trial, noting that Mrs. Swafford passed away in 2021. See Tenn. R. Evid. 804(a)(4), (b)(1) (Hearsay exception for former testimony of an unavailable witness). The Defendant opposed the admission of Mrs. Swafford's testimony, and the trial court held a hearing to determine the matter.

At the pretrial evidentiary hearing, the Defendant contended that Mrs. Swafford's testimony carried no probative value and was "almost totally inconsistent" with the victim's testimony. See Tenn. R. Evid. 401, 402. He also argued that Mrs. Swafford's testimony would be inadmissible to impeach the Defendant, who had not yet decided whether he would testify. The Defendant claimed that the State's use of the testimony would further be improper because the State would encourage the jury to disbelieve Mrs. Swafford's account and that the testimony would serve to create undue confusion for the jury.

The State responded that it intended to introduce Mrs. Swafford's testimony to contradict the Defendant's statements to the police. It further noted that Mrs. Swafford's testimony was relevant in that, by her account, she was a potential witness to the Defendant's charged crimes.

At the conclusion of the hearing, the trial court held that Mrs. Swafford's testimony was admissible, finding that it complied with Tennessee Rule of Evidence 804's exception to the hearsay rule for former testimony because Mrs. Swafford was deceased and that her testimony was given "under oath, subject to cross-examination." The trial court further held that there was no basis under Rule 403 to exclude the testimony for undue prejudice, noting that it struggled to see how her testimony was "prejudicial at all."

The Defendant asserts that the trial court erred in three ways: first, by finding that the testimony was admissible under Tennessee Rule of Evidence 403; second, by finding that the testimony was admissible under the former testimony exception to the hearsay rule; and third, by finding that the testimony was admissible as impeachment evidence against the Defendant.[1] The State responds that the trial court properly found that Mrs. Swafford's testimony carried no potential for unfair prejudice and that the Defendant's hearsay and impeachment arguments are waived for failure to preserve them in his motion for new trial. We will address each of the Defendant's arguments in turn.

1. **Tennessee Rule of Evidence 403.** The Defendant argues that the trial court abused its discretion in determining that the probative value of Mrs. Swafford's testimony outweighed its potential for undue prejudice in admitting it under Rule 403. Through this argument, the Defendant maintains that the State's true purpose in offering Mrs. Swafford's testimony was to attribute it to him and attack the credibility of his statement to the police. The Defendant also argues that the testimony presented a significant danger of confusion of the issues and misleading the jury. The State responds that the trial court properly admitted the evidence by finding that it was not unduly prejudicial and was instead relevant as an alternative account of the events giving rise to the charged offenses.

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined by the Tennessee Supreme Court as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" State v. Banks, 564 S.W.2d 947,

---

[1] We have reordered the Defendant's arguments for clarity.

951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Notes). "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror." State v. Young, 196 S.W.3d 85, 106 (Tenn. 2006) (citations and internal quotation marks omitted). Whether evidence is relevant is a decision left to the discretion of the trial court, and this court will not overturn a trial court's determination regarding relevancy without a showing that the trial court abused its discretion. State v. Brown, 373 S.W.3d 565, 573 (Tenn. Crim. App. 2011) (citing State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995)).

The trial court admitted Mrs. Swafford's testimony over the Defendant's objection at the pretrial evidentiary hearing. Though the Defendant conceded that Mrs. Swafford's testimony met Rule 804(b)(1)'s requirements—a position he no longer takes on appeal—he argued that the State's intention in offering Mrs. Swafford's testimony would be to "impeach their own client," which would "create confusion for the jury." The Defendant further argued that the State was attempting to prove "some kind of plan or scheme concocted" between the Defendant and Mrs. Swafford, for which the State would need to introduce additional proof. The State responded that the Defendant called Mrs. Swafford to testify at his preliminary hearing and that she presented an alternative version of events which did not match the Defendant's statement to the police. The State also argued that the "phone calls between [Mrs. Swafford] and the Defendant . . . would indicate that this was something they did work up maybe, but that would be for the trier of fact to decide." The Defendant in response reiterated that the State would be presenting an account of events it did not accord as true.

In admitting the testimony, the trial court held that Mrs. Swafford "purports to be a fact witness who observed the interactions that . . . occurred between these individuals. . . . [I]n fact, she says there was no rape or anything that occurred." The trial court reasoned that Mrs. Swafford's account would not be unduly prejudicial to the Defendant unless the Defendant "is going to get on the witness stand and say that he did it." The trial court noted that it "struggle[d] to see" any prejudicial effect in the testimony's introduction.

The trial court did not abuse its discretion in admitting Mrs. Swafford's testimony. Rule 401's relevancy standard is broad, allowing for the admission of proof so long as it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." Tenn. R. Evid. 401. Mrs. Swafford's testimony as a purported eyewitness was certainly probative because, despite its contradictions with the Defendant's statement, it provided a basis upon which the jury could convict the Defendant. Mrs. Swafford's testimony corroborated the Defendant's account that he forcibly took the victim's cell phone and smart watch from her, and though she averred that the Defendant never struck the victim, she nevertheless described an extended dispute and "back[] and forth" between the Defendant and the victim, from which the jury could have inferred the elements of the Defendant's aggravated assault when considering it in conjunction with the Defendant's statement. The trial court instructed the

jury to consider Mrs. Swafford's testimony as though she had testified in-person, and the jury was free to credit that testimony as it saw fit.

The Defendant nevertheless maintains that any probative value presented by Mrs. Swafford's testimony was outweighed by the danger of undue prejudice, confusion of the issues, and misleading the jury due to its tendency to contradict the Defendant's statement to the police. He contends that the State was impermissibly allowed to present Mrs. Swafford's testimony as though he had adopted it during closing arguments. However, the Defendant did not object at the trial to the State's overtures that the Defendant adopted Mrs. Swafford's testimony and that the testimony was too "insane" to be accredited by the jury. Simply because Mrs. Swafford's purported eyewitness testimony painted a different version of events from the Defendant's statement to the police does not, in and of itself, amount to undue prejudice. Mrs. Swafford testified that the Defendant did not kidnap or rape the victim, and in this manner, her testimony tended to have more of an exculpatory than prejudicial effect such that it would not lead the jury to base its decision to convict the Defendant on an improper basis. Accordingly, the Defendant has not shown that the trial court abused its discretion in admitting Mrs. Swafford's testimony.

**2. Hearsay.** The Defendant also claims that the trial court erred in admitting Mrs. Swafford's preliminary hearing testimony under Tennessee Rule of Evidence 804(b)(1)'s exception to the hearsay rule for former testimony. He argues that because the State presented Mrs. Swafford's testimony as untrue, her testimony was offered for its falsity and, therefore, was not hearsay. See State v. Price, 46 S.W.3d 785, 807 (Tenn. Crim. App. 2000) ("If an out-of-court statement is not offered to prove the truth of the matter asserted, such as a statement offered for impeachment purposes, it is not hearsay.") (citing State v. Howell, 868 S.W.2d 238, 252 (Tenn. 1993)). The State responds that the Defendant has waived this argument for failing to preserve it by objecting contemporaneously and failing to raise it in his motion for a new trial.

Tennessee Rule of Appellate Procedure 3(e) states that "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." The rule requires that issues presented in the motion for new trial be "specified with reasonable certainty so as to enable appellate courts to ascertain whether the issue was first presented for correction in the trial court." Waters v. Coker, 229 S.W.3d 682, 689 (Tenn. 2007) (citing State v. Gauldin, 737 S.W.2d 795, 798 (Tenn. Crim. App. 1987)). "[A]ppellate courts should review a motion for a new trial in the light most likely to preserve the issue alleged, although courts cannot create an error where none has been legitimately preserved." Fahey v. Eldridge, 46 S.W.3d 138, 146 (Tenn. 2001). The Tennessee Supreme Court explained:

> Before an issue can be properly preserved in a motion for a new trial under
> Rule 3(e), a well-pleaded motion should (1) allege a sufficient factual basis

for the error by setting forth the specific circumstances giving rise to the alleged error; and (2) allege a sufficient legal basis for the error by identifying the trial court's claimed legal basis for its actions and some articulation of why the court erred in taking such actions.

Id.

The Defendant raised several issues for review in his motion for new trial, setting forth his evidentiary claims under a section titled "Miscellany." As relevant here, the Defendant argued the following in his motion for new trial:

> The preliminary testimony of [Mrs. Swafford], now deceased, was introduced over defense counsel's objection, and indeed, was introduced as though the defense had ever adopted that testimony as true. [] The defense continues to assert that Mrs. Swafford's testimony is irrelevant and should have been excluded pursuant to Tennessee Rule of Evidence 403 in that any probative value (of which there was none, counsel asserts) was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. . . .  In addition, further confusion arose from the ludicrousness of Mrs. Swafford's testimony, which[,] if attributed by the jury to [the Defendant,] would in and of itself severely damage both his credibility and the credibility of the viable defense that was offered.

The Defendant also presented more specific claims regarding the trial court's alleged error in admitting Mrs. Swafford's testimony under Rule 403.

We conclude that the Defendant failed to preserve the issue of whether Mrs. Swafford's statement was properly admitted under Rule 804(b)(1).  First, we can find no proof that the Defendant objected at any time to the trial court's admission of Mrs. Swafford's testimony under Rule 804(b)(1).  To the contrary, the Defendant conceded at the pretrial evidentiary hearing that he had "never argued to the court that [Mrs. Swafford's testimony] didn't fit" the "requirements" of Rule 804(b)(1), noting that he was principally "making a [Rule 403] argument" against its introduction.  Further, the word "hearsay" appears only once in the Defendant's motion for new trial, and it does so in a wholly unrelated argument.  This failure to raise the issue with reasonable specificity constitutes waiver.  See Waters, 229 S.W.3d at 689; see also Tenn. R. App. P. 3(e).

Waiver notwithstanding, the Defendant requests this court to review the issue for plain error.  The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b).  In order for this court to find plain error,

(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[P]lain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotation marks and citations omitted). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing United States v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

The Defendant argues we should find plain error in the trial court's breach of a clear and unequivocal rule of law. He contends that the trial court's admission of Mrs. Swafford's testimony was improper under Rule 804(b)(1) because the testimony was not offered for the truth of the matter asserted. Instead, the Defendant argues that the State's true purpose in introducing Mrs. Swafford's testimony was to impeach and contradict the Defendant's statement to the police, which was markedly different from Mrs. Swafford's preliminary hearing account of the events giving rise to the Defendant's charges.

We conclude that no plain error exists in the trial court's admission of Mrs. Swafford's testimony under the hearsay exception for former testimony. The State introduced Mrs. Swafford's testimony as a purported additional eyewitness account to the events giving rise to the charged offenses, which the trial court correctly found to be highly probative under Rule 403. Inasmuch as the evidence was used to impeach the Defendant, having already concluded that the testimony's probative value outweighed any potentially prejudicial effect and that the evidence adduced at trial was more than sufficient to sustain the Defendant's convictions, we do not find consideration of this issue to be necessary to do substantial justice.

**3. Impeachment Evidence.** Finally, the Defendant argues that the trial court erred in admitting Mrs. Swafford's testimony as impeachment evidence. The Defendant maintains that the State's "sole purpose" in introducing Mrs. Swafford's testimony was to attack the Defendant's credibility by both improperly attributing Mrs. Swafford's account to the Defendant as a prior inconsistent statement and as a contradiction to his statement to the police. The State responds that the Defendant has waived the issue for failing to preserve the issue in his motion for new trial.

In his motion for new trial, the Defendant argued that Mrs. Swafford's testimony was introduced over his objection "as though [the Defendant] had ever adopted that testimony as true" and caused "confusion" to the jury which "severely damage[d] both his credibility and the credibility of the viable defense that was offered." The Defendant cites a number of evidentiary rules and case law in his brief but refers to none in his motion for a new trial. He contends that his reference to the evidence's tendency to damage his credibility was reference enough to preserve the issue of improper use of impeachment evidence. Though we review motions for new trial in the light most likely to preserve the issue alleged, the issue must first be alleged with a sufficient factual and legal basis to notify the trial court of the circumstances giving rise to and the legal precedent against its error. See Fahey, 46 S.W.3d at 146. The Defendant's motion for a new trial did not do so with the requisite specificity to preserve this issue, so it too is waived. Tenn. R. App. P. 3(e).

The Defendant asserts that this issue should also be reviewed for plain error. He argues that the trial court breached a clear and unequivocal rule of law by admitting Mrs. Swafford's testimony because the State improperly attempted to attribute it to the Defendant. He also argues that the State's use of the testimony to impeach him as a prior inconsistent statement or contradiction is inappropriate because he did not give the testimony himself. He further maintains that the State did not introduce the testimony for its truth but rather solely for its impeachment value, noting that the State characterized Mrs. Swafford's testimony as an untrue, "insane" story that "was just too disgusting to be believable" during closing arguments.

We conclude that the Defendant has not established that plain error exists in the trial court's admission of Mrs. Swafford's testimony as impeachment evidence. First, the Defendant did not object to the State's characterization of Mrs. Swafford's testimony as untrue during the State's closing arguments, and, given the sufficiency of the convicting evidence and the length of closing arguments, this statement likely had a minimal impact on the jury's decision. The State conceded at the pretrial evidentiary hearing that its presentation of Mrs. Swafford's alternative account could incidentally impact the credibility the jury afforded to the Defendant's statement to the police, but the trial court properly concluded that any resulting prejudicial effect was outweighed by its potential probative value. Accordingly, we conclude that consideration of this issue is not necessary to do substantial justice.

## CONCLUSION

Based on the foregoing analysis, we affirm the trial court's judgments.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE